# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| **LAVERTA BOWLES, on behalf of** | ) |
| **LAVERTA A. BOWLES-BROWN,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **Case number 4:05cv2411 TCM** |
| | ) |
| **MICHAEL J. ASTRUE,** | ) |
| **Commissioner of Social Security,[1]** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405 (g) for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security ("Commissioner"), denying Laverta A. Bowles-Brown supplemental security income benefits ("SSI") under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 1381-1383d. Plaintiff has filed a brief in support of her complaint; the Commissioner has filed a brief in support of his answer. The case is before the undersigned for a final disposition pursuant to the written consent of the parties. See 28 U.S.C. § 636(c).

---

[1]Mr. Astrue was sworn in as the Commissioner of Social Security on February 12, 2007, and is hereby substituted as defendant pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

## Procedural History

When her daughter, Laverta A. Bowles-Brown ("Plaintiff"), was five years' old, Ms. Laverta Bowles filed an application for SSI benefits on her behalf, alleging a disability beginning at her second birthday and caused by a developmental, speech, and language delay. (R. at 47-48.)[2] The application was denied initially and after a hearing held in August 2004 before an Administrative Law Judge ("ALJ"), Peter J. Baum. (Id. at 13-20, 27-31, 274-91.) The Appeals Council denied review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 5-7.)

## Testimony Before the ALJ

Ms. Bowles was the only witness to testify at the administrative hearing.

She testified that Plaintiff was born on July 22, 1998, and lived with her and a thirteen-old brother, Martin Bowles, who is receiving SSI benefits for a learning and speech disability. (Id. at 279.) Plaintiff and Martin are both in school; she is going into the first grade, he into the eighth grade. (Id. at 280.)

Plaintiff enjoyed kindergarten. (Id.) Although she had academic troubles, she liked going to school and playing with other children. (Id.) She did try "to tell the teacher how to run things." (Id.)

---

[2]References to "R." are to the administrative transcript filed by the Commissioner with his answer.

Plaintiff had been seeing a child psychiatrist, Dr. Smith, every month for a year. (Id. at 282.) The medical records from St. John's Mercy were his. (Id. at 283.) Dr. Smith had been of no help to Plaintiff. (Id.) Ms. Bowles saw no improvement in her under his care or with the medication he had prescribed. (Id. at 283-84.) She takes the medication, ten milligrams of Ritalin, once a day, before school. (Id. at 284, 289.)

Ms. Bowles receives reports from Plaintiff's school that she cannot sit still. (Id. at 285.) "She's always busy, trying to act grown." (Id.)

Plaintiff does socialize with children in the neighborhood. (Id.) She has friends over and goes to their houses. (Id. at 285-86.) The reports Ms. Bowles receives from the parents when Plaintiff visits their houses are the same she receives from school – Plaintiff tries to act grown up, will not sit still, and does not listen. (Id. at 286.) When other children visit Plaintiff at her house, she gets along with them "very well." (Id.)

In response to questions by her attorney, Ms. Bowles described Plaintiff as hyperactive. (Id. at 287.) Specifically, Plaintiff fidgets, moving from one activity to another. (Id.) She does not, however, engage in any dangerous activities and had not been referred at school for discipline. (Id.) Ms. Bowles and Plaintiff's teacher talk over the telephone approximately once a week. (Id. at 288.) The teacher tells her what Plaintiff had done or not done. (Id.)

An Individual Education Program ("IEP") developed for Plaintiff in April 2003 scheduled her for 60 minutes each of occupational therapy and speech and language

- 3 -

therapy. (Id.) Another IEP was developed for Plaintiff in December 2003; the type and amount of services did not change. (Id.)

## **Medical, School, and Other Records Before the ALJ**

The documentary record before the ALJ included records completed on Plaintiff's behalf, school records, and medical records.

A function report completed by Ms. Bowles in April 2003 described Plaintiff as having problems talking clearly; however, she could be understood "most of the time" by people who knew her well and "some of the time" by people who did not. (Id. at 109, 111.) Plaintiff was limited in her ability to communicate, progress in learning, and "pay attention and stick with a task." (Id. at 112-13, 115.) Her ability to communicate was limited in that she did not ask a lot of what, why, and where questions, did not talk about what she was doing, did not talk about things and activities that happened in the past, did not tell a made-up or familiar short story, did not answer questions about a short, read-aloud story, and did not deliver simple messages. (Id. at 112.) Her ability to progress in learning was limited in that she did not ask what words meant, know her telephone number, define common words, read capital letters, or understand a joke. (Id. at 113.) Her impairments adversely affected her behavior with other people in that she did not play board games or play "pretend" with other children. (Id. at 114.) Also, she could be aggressive toward other children and her parents. (Id.) "It [was] either her way or no way at all." (Id.) Her impairments adversely affected her habits and her ability to care for her personal needs in

- 4 -

that she was not completely toilet-trained and did not put her toys away or dress, wash, or brush her teeth without help. (Id. at 115.) She could pay attention to the television, music, stories, or games for only 15 minutes. (Id.) She constantly moved. (Id.) Her physical abilities were not limited. (Id. at 114.) She had no problems seeing or hearing. (Id. at 110.)

The following month, Ms. Bowles completed a Daily Activities Report on Plaintiff's behalf. (Id. at 120-23.) She again described Plaintiff as being always active. (Id. at 120.) Plaintiff's condition had not changed since she was two years' old. (Id.) She was "lovable" with her brother and "sometimes aggressive." (Id.) With other people, she could also be friendly and kind at times and upset and angry at other times. (Id. at 122.) With children her own age, she sometimes got along with them and sometimes considered them as rivals. (Id. at 123.) She was not then taking any medication. (Id. at 121.)

Plaintiff's school records included progress reports and documents relating to her IEPs.

In September 2002, when Plaintiff was four years' old, her mother requested that she be screened for enrollment in a preschool Head Start program. (Id. at 65.) Ms. Bowles' goals for Plaintiff were for her to properly say her full name, recognize the letters in her first name, learn to count from one to ten, and recognize eight basic colors and five shapes. (Id. at 66.) Plaintiff quickly learned to properly say her full name. (Id. at 66.)

In January 2003, the Head Start program referred Plaintiff to the Early Childhood Special Education Program. (Id. at 69, 126.) A psychological and educational assessment noted the following areas of concern: fine motor skills development; social and emotional and behavioral skills development; articulation; language; cognition; adaptive behavior; and pre-academic readiness skills. (Id.) The following observations were made when Plaintiff was given the Stanford-Binet Intelligence Test – Fifth Edition ("SB-V"):

> During the administration [Plaintiff] demonstrated an unusually high amount of fidgetiness, shyness and an outright refusal to either verbally respond or perform task. This was most evident if she was required to sit without creating self-directed distracting behavior and listen attentively and then respond in accordance to the instructions/commands. . . . It was extremely difficult to convince her to perform once it was clear she was not going to. Even with parental assistance she would not perform if she thought she could not give a response or perform a task. Some of these behaviors gave the appearance of shyness others were considered to be just plain old stubborn. Her greatest area of difficulty was in the Knowledge Factor and she had more difficulty with nonverbal material here than with verbal material. This lower results [sic] was largely due to her refusal to demonstrate certain actions that showed she understood how certain common or everyday items were used. She preferred to give verbal responses, which were not incorrect, but the object is to find out if she can demonstrate how things work without having to talk.

(Id. at 70, 127.) Of the five areas assessed by the SB-V, Plaintiff received a low average score only in the Knowledge area. (Id.) She had an average nonverbal, verbal, and full scale IQ. (Id.)

A home visit was conducted that same month by two educators. (Id. at 62.) One noted that Plaintiff welcomed the visit and (a) asserted herself verbally, expressing her

- 6 -

ideas and needs; (b) demonstrated independence and self-direction when participating in activities; and (c) demonstrated self-help skills when doing a cutting/glueing project. (Id.) The reporter concluded that Plaintiff "demonstrate[d] age-appropriate social/emotional development" and did not require further evaluation. (Id.)

A progress report in February 2003 noted that Plaintiff could prepare a bowl of cereal for herself, sort by colors, put simple puzzles (those with 10 to 24 pieces) together, count from 1 to 13 without problems, identify 2 of 6 shapes, and recall events while participating in story telling. (Id. at 59.) When told to follow simple instructions, she would not do so unless she wanted to. (Id.) If she did not want to participate, she would withdraw or have an "outburst." (Id.) The teacher noted Ms. Bowles' concerns about Plaintiff's speech. (Id.) The next steps to be taken at school and at home were to enroll Plaintiff in a classroom setting, enhance her social skills, and increase her attendance at the program. (Id.) The teacher recommended that Plaintiff be referred for testing. (Id.)

Subsequently, that same month, Plaintiff was given a test to assess her readiness for kindergarten. (Id. at 68, 138.) She was average in the area of social interaction. (Id.) She was unable to print her name, and was seriously below average in use of body concepts, visual discrimination, visual motor, and alphabet knowledge. (Id.) Her level of acquired knowledge and verbal conceptual skills were average; she was below average in visual skills. (Id.)

- 7 -

The next month, the interview edition of Vineland Adaptive Behavior Scale ("Vineland") was completed with "parental input, to assess performance or day-to-day activities and the ability to get along with others." (Id. at 71, 128.) There were five domains: communications; daily living skills; socialization; motor skills; and adaptive behavior composite. (Id.) Plaintiff had an age equivalency of one year and ten months in communications and socialization. (Id.) Her adaptive behavior composite age equivalency was two years and four months. (Id.)

By April 2, Plaintiff could count from one to ten without hesitation and could recognize the eight basic colors and five of six shapes. (Id. at 66.) At the same time, she had an occupational therapy evaluation to assess her fine motor skills. (Id. at 72-75, 129-32.) She demonstrated an average ability to use her hands and arms to grasp objects, copy figures, and manipulate objects. (Id. at 72, 73, 129, 130.) With the exception of two sections of a test she was not able to complete due to her lack of focus, her visual perceptual skills were age-appropriate. (Id.) Her visual motor skills were below average when forming shapes and copying a cross. (Id.) The examiner observed that Plaintiff was very polite and very impulsive. (Id. at 72, 129.) She was able to focus better after she was moved to a room with less toys than were in the testing room. (Id.) She enjoyed movement activities. (Id.) "She was easy to redirect although many outbursts were heard through the testing session – laughing or talking loudly." (Id.) It was recommended that she be given gross motor activities throughout the day to help her focus when sitting; the

- 8 -

amount of auditory and visual distractions be decreased when she was trying to focus on classroom work; and that she be given an opportunity for "mouth tools" during the day, e.g., blowing pinwheels or chewing on straws. (Id. at 73, 130.)

In the beginning of April, Plaintiff was given several tests, including the Developmental Tasks of Kindergarten Readiness-II test. (Id. at 76, 133.) She was able to give some personal information, i.e., her name, age, and date of birth, but not other information, i.e., her address and telephone number. (Id.) She could identify body parts and colors, understand some age-appropriate relational concepts, and count to 13, but could not recognize any letters of the alphabet, print the letters in her first name, or classify objects by a named category. (Id.) She had a short attention span during testing, was impulsive, and able to be distracted. (Id.) She stopped playing with toys in order to resume testing only when the adults in the room, including her mother, insisted. (Id.) If the activity was something she was not interested in, she "shut down." (Id.) "Candy was used in order to complete the assessment." (Id.)

Five other tests were given to assess her speech and language development. (Id. at 77-79, 134-36.) In one test, the Preschool Language Scale-3, she demonstrated, inter alia, an ability to group objects by category, compare objects by weight, and understand negatives. (Id. at 77, 134.) She could also repeat six to eight word sentences, talk about remote events, and complete analogies. (Id.) Her results on the test indicated that her receptive and expressive language skills were equivalent to those of a child 15 months

- 9 -

younger than Plaintiff. (Id.) Plaintiff's performance on tests to assess her expressive and receptive vocabulary was also below the expected level for her age. (Id. at 77-78, 134-35.) Plaintiff was missing several teeth due to severe decay; the missing teeth might "result in some sound distortion." (Id. at 78, 135.) During testing, Plaintiff displayed a short attention span, distractability, and impulsiveness. (Id.) "She was quick to refuse but easy to coerce." (Id.) She "would 'shut down' as test items increased in difficulty but was often able to return to those items after a break." (Id. at 79, 136.) The examiner concluded that:

> [in] a classroom setting [Plaintiff] would have difficulty responding appropriately to questions and following directions. Her poor intelligibility would probably result in her repeating herself several times before she is understood which would increase her frustration. Overall expressive language skills were delayed for a child her age.

(Id.)

In a separate session, Plaintiff was again given the SB-V. (Id. at 80, 137.) As before, Plaintiff demonstrated an average IQ on the SB-V and had an average score in all but one of the five factors; the one factor was Knowledge. (Id.) Based on her parents' response, her scores on three of the four domains on the Vineland were low and on the fourth domain, Motor Skills, was moderately low. (Id. at 80, 100, 137, 139.) Her average score reflected an age equivalency of two years and four months. (Id. at 80, 137.)

A few weeks after the test sessions, five educators met with Plaintiff's mother to develop an IEP for Plaintiff. (Id. at 81-102, 145-62.) Her diagnosis was "developmental

- 10 -

delay." (Id. at 81, 145.) Her behavior that could affect her performance in school was summarized as follows:

> [Plaintiff] is currently functioning on level with age peers in cognitive skills/abilities. Her language skills are slightly below her cognitive level. Overall fine motor skills are also commensurate with same age peers. [Plaintiff] has a short attention span, is easily distracted, impulsive and non-compliant. Her in-seat behaviors are poor. She also has difficulty expressing herself and in understanding verbal directions. [Plaintiff] often seeks attention from adults and can be physically-verbally aggressive towards peers.

(Id. at 83, 147.) She was also independent and friendly and had a good sense of humor. (Id.) She was occasionally bossy. (Id.) Her behavior did not impede other children's learning. (Id. at 87, 151.) Eight goals were developed for Plaintiff, including attending to a non-preferred activity without impulsiveness or distractability for at least ten minutes on three or four occasions, staying in a designated seat or area for at least nine out of ten minutes on four occasions, increasing her speech intelligibility at the word level, and describing a three to four step procedure given auditory and visual cues. (Id. at 89-95, 153-59.) Plaintiff was to be provided with 60 minutes per week of speech therapy and of language therapy. (Id. at 144, 146.) Recommendations included a highly structured environment and a behavior management plan. (Id. at 141.)

Plaintiff's progress report at the end of her kindergarten year showed improvement in the academic areas of reading, language, spelling, handwriting, science and health, and social studies. (Id. at 142-48.) In reading, language, and science and health, she went from

- 11 -

a "not yet" to "secure." (Id.) She made the same improvement in handwriting. (Id.) In spelling and social studies she went from a "not yet" to "developing." (Id.) And, in mathematics, she went from a "developing" to "secure." (Id.) At the beginning of the school year, she inconsistently demonstrated two of the five reading skills, two of the four language skills, one of the four science and health skills, and one of the three social studies skills. (Id.) At the end of the school year, she was inconsistent in only one of these sixteen skills. (Id.) She remained inconsistent in the one spelling skill. (Id.) Plaintiff also improved in the area of work habit skills. (Id. at 143.) At the beginning of the school year, she was inconsistent in three of the five skills; at the end, she was consistent in all, including following directions. (Id.) She consistently demonstrated each of the five skills in personal growth, including practicing s elf-control and obeying school rules and regulations. (Id.) Her teacher noted at the end of the third quarter that she was a good student. (Id.)

At the end of kindergarten, Plaintiff's IEP was revised for the upcoming school year. (Id. at 163-67.) She was to receive 300 minutes each week in special education and 60 minutes each week in speech and language therapy. (Id. at 164.) She would be outside the regular class less than 21% of the time. (Id.) Her learning disability was in auditory expression. (Id.) She had difficulty expressing herself and in understanding verbal directions. (Id. at 165.) Although she had a short attention span, she was easily redirected. (Id.) Also, she was impulsive. (Id.) Her strengths included her cognition, pre-academic

- 12 -

readiness, and her fine and gross motor skills. (Id.) Her previous IEP described her in-seat behavior as poor; however, for this IEP she sat and performed the tasks presented. (Id. at 166.) She showed little improvement in her speech, but she had only been in therapy a short time. (Id.) She was attentive and cooperative during therapy sessions. (Id.)

Four months later, in January, 2004, Plaintiff's IEP was again revised. (Id. at 182-97.) The minutes of special education and speech and language therapy remained as before. (Id. at 183.) It was additionally noted that Plaintiff cried easily if she did not understand the skills presented. (Id. at 184.) She now worked well at her seat. (Id. at 185.) And, although she had difficulty with spacing and staying on the line, she could legibly write her name. (Id.) Her language skills continued to be the primary concern. (Id. at 186.) She had significantly improved her production of "consonant clusters"; however, her accuracy decreased as her spontaneous speech increased. (Id.) Her behavior continued not to impede others' learning. (Id. at 189.) Seven goals were developed for Plaintiff, including answering "wh" (where, why, when) questions given auditory and visual cues in three of four attempts and describing a three to four step procedure given auditory and visual cues in three of four attempts. (Id. at 191-95.)

Records before the ALJ also included Plaintiff's medical records from her pediatrician and from Clifton Smith, D.O.

The records from the pediatrician, Esperanza M. Pimenthal, M.D., begin when Plaintiff was eight weeks' old and end the month after her fifth birthday. (Id. at 210-12,

- 13 -

237-38.) They are unremarkable as to Plaintiff's physical health. (Id.) Shortly after Plaintiff's second birthday, a notation reads: "hyper-aggressive behavior; delay in speech; temper tantrums." (Id. at 211, 237.)

Dr. Smith's records are of two visits.

On November 6, 2003, Dr. Smith noted Plaintiff's mother's report that Plaintiff was behind on her letters and colors, but her teacher stated that she was "getting better." I'd 214.) Plaintiff was not then on medication, but a low dose of Concerta was to be tried. (Id.) Her diagnosis was a learning disorder, not otherwise specified, or, possibly, ADHD. (Id.) The next month, Plaintiff's mother reported to Dr. Smith that Plaintiff was "doing good." (Id. at 213.) There was no change on the Concerta. (Id.) Plaintiff informed Dr. Smith that she had learned her "ABCs" and recited them with 95% accuracy. (Id.) Her diagnosis remained the same. (Id.)

A noted dated August 11, 2004, lists a diagnosis of ADHD and oppositional defiant disorder, moderately severe. (Id. at 215, 271.)

Records from St. Louis Regional Center were also before the ALJ.

A case worker[3] interviewed Plaintiff and her mother in May 2003 pursuant to Ms. Bowles' request for case management services through St. Louis Regional Center. (Id. at 231-34.) She described Plaintiff as being very impulsive and having trouble following rules and regulations. (Id. at 231.) Plaintiff's self-help/adaptive, mobility/motor, and

___

[3]The case manager was already assigned to Ms. Bowles as a result of her son's needs.

- 14 -

independent living skills were within normal limits. (Id. at 232-33.) Plaintiff had functional limitations in answering questions, following rules and regulations, recognizing letters, and staying focused. (Id.) Her mother reported that she had tantrums that could last for ten minutes and had a history of being verbally and physically aggressive toward adults and her peers. (Id. at 233.)

Subsequently, the case worker met with Ms. Bowles on October 3. (Id. at 249, 265.) She reported that Plaintiff was going to the psychiatrist. (Id.) She had had no problems in school.[4] (Id.)

In July 2003, a Childhood Disability Evaluation Form[5] was completed for Plaintiff by non-examining consultants. (Id. at 203-08.) Her impairments – a speech and language delay and developmental delay – were severe but did not meet or medically equal a listing-level impairment. (Id. at 203.) Assessing the affect of these impairments on Plaintiff's ability to function in six domains, the consultants concluded that Plaintiff had a marked limitation in the domain of acquiring and using information and a less than marked limitation in the domains of interacting and relating with others, moving about and manipulating objects, and caring for herself. (Id. at 205, 207.) She had no limitation in the domain of attending and completing tasks and health and physical well-being. (Id.) In the

---

[4]The majority of the case manager's notes concern meeting the financial and housing needs of Ms. Bowles and her children.

[5]A "Childhood Disability Evaluation Form" is completed for children whose impairments are severe but are not a listed impairment. See 20 C.F.R. § 416.924(g).

- 15 -

domain of acquiring and using information, it was noted that Plaintiff's mother reported that she had limited communication functioning at home and that a test had revealed her language functioning to be two standard deviations below the same age peers. (Id. at 205.) In the domain of interacting and relating with others, it was noted that Plaintiff's speech could be understood most of the time. (Id.) Her mother reported that she had to have her own way and could be aggressive toward her parents and other children; she could also be sweet. (Id.) She had difficulty answering "wh" questions. (Id.) In the domain of moving about and manipulating objects, it was noted that Plaintiff could copy circles and lines but not a cross. (Id. at 207.)

## The ALJ's Decision

The ALJ first outlined the standard for finding a child disabled under the Act. (Id. at 13-14.) He then addressed the question whether Plaintiff had a severe impairment or combination thereof. (Id. at 15.) The ALJ concluded that Plaintiff had ADHD and an oppositional defiant disorder. (Id.) Both resulted in more than a minimal functional limitation and were, therefore, severe. (Id. at 16.) Noting that her attorney argued that the caseworker's assessment and the January 2004 IEP supported a funding that Plaintiff had marked limitations in the domains of attention and concentration and cognition and development, the ALJ found both not to be persuasive. (Id. at 19.) Rather, the ALJ concluded, Plaintiff had marked limitations in the domain of acquiring and using information; less than marked limitations in the domains of interacting and relating with

- 16 -

others, moving about and manipulating objections, and caring for yourself; and no limitations in the domains of attending and completing tasks and health and physical well being. (Id. at 19.) Citing Social Security Ruling 96-7, the ALJ further concluded that Ms. Bowles's testimony was "essentially credible." (Id. at 20.) Plaintiff was not disabled within the meaning of the Act.

## Legal Standards

Title 42 U.S.C. § 1382c(3)(C)(i) provides that "[a]n individual under the age of 18 shall be considered to be disabled for purposes of [SSI] if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." The Commissioner's decision denying a child SSI benefits is reviewed by this Court to determine whether it is supported by substantial evidence. **Rucker v. Apfel**, 141 F.3d 1256, 1259 (8th Cir. 1998); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl v. Shalala**, 47 F.3d 935, 937 (8th Cir. 1995). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." **Cox v. Apfel**, 160 F.3d 1203, 1206-07 (8th Cir. 1998). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision. **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir.

- 17 -

1998); **Bryant v. Apfel**, 141 F.3d 1249, 1250 (8th Cir. 1998). The court may not reverse that decision merely because substantial evidence would also support an opposite conclusion. **Tate v. Apfel**, 167 F.3d 1191, 1196 (8th Cir. 1999); **Pyland v. Apfel**, 149 F.3d 873, 876 (8th Cir. 1998). See also **Reed v. Sullivan**, 988 F.2d 812, 815 (8th Cir. 1993) ("[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." (interim quotations omitted)).

Under the Act, the ALJ inquires into (1) whether the child was currently engaged in substantial gainful activity; (2) whether the child suffered severe impairments or a combination of severe impairments; and (3) whether the child's impairments met or equaled any listed impairments. **Neal ex rel. Walker v. Barnhart**, 405 F.3d 685, 688-89 (8th Cir. 2005); **Bryant**, 141 F.3d at 1251. If, as in the instant case, the ALJ finds at step two of the evaluation that a child's impairments are severe, then the question at step three is whether those severe impairments cause "marked and severe functional limitations" and whether they meet the duration requirement of at least one year. 20 C.F.R. § 416.924(d). "An impairment(s) causes marked and severe functional limitations if it meets or medically equals the severity of a set of criteria for an impairment in the listings, or if it functionally equals the listings." Id. See also 20 C.F.R. § 416.924(a); 20 C.F.R. Part 404, Subpart P, Appendix 1, Part B.

- 18 -

"[I]n general, a child's impairment(s) is of 'listing level severity' if it causes marked limitations in two broad areas of functioning or extreme limitations in one such area." 20 C.F.R. § 416.925(b)(2). A limitation is "marked" for children from age 3 to age 18 if it is "'more than moderate' and 'less than extreme.'" 20 C.F.R. § 416.926a(e)(2). A "marked" limitation is also found when the impairment(s) "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." Id. There may be a "marked" limitation in only one activity or in several activities as a result of the interactive and cumulative effects of the child's impairment(s). Id. A limitation is "extreme" for the same age group if the impairment(s) "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3). "'Extreme' limitation also means a limitation that is 'more than marked.'" Id.

As noted by the ALJ, there are six broad domains of development or functioning that are addressed when considering the impairments of a child of Plaintiff's age. For Plaintiff's age, the criteria for the first domain, acquiring and using information, is "[w]hen you are old enough to go to elementary and middle school, you should be able to learn to read, write, and do math, and discuss history and science." 20 C.F.R. § 416.926a(g)(2)(iv). In the second domain, attending and completing tasks, a child's ability to focus and maintain attention, and to begin, carry through, and finish his or her activities, including the pace at which those activities are performed and the ease with which they are changed, is considered. Id. § 416.926a(h). A child of Plaintiff's age "should be able to focus [her]

- 19 -

attention in a variety of situations in order to follow directions, remember and organize [her] school material, and complete classroom and homework assignments." Id. § 416.926a(h)(2)(iv). The third domain is interacting and relating with others. Id. § 416.926a(i). In this domain, a child of Plaintiff's age should, when entering school, "be able to develop more lasting friendships with children" her age. Id. § 416.926a(i)(2)(iv). Such a child should also "begin to understand how to work in groups to create projects and solve problems . . . [and] have an increasing ability to understand another's point of view and to tolerate differences." Id. Indications of limited functioning in this domain are the lack of close friends and difficulties playing sports with rules. Id. § 416.926a(i)(3)(ii) and (iv). The fourth domain is moving about and manipulating objects. Id. § 416.926a(j). The fifth domain is caring for oneself. Id. § 416.926a(k). Relevant considerations in this domain are "how well [a child] maintain[s] a healthy emotional and physical state, including how well [the child] get[s] [her] physical and emotional wants and needs met in appropriate ways[.]" Id. (alterations added). A child Plaintiff's age should, among other things, "begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior." Id. § 416.926a(k)(2)(iv). The sixth domain is health and physical well being. Id. § 416.926a(l).

## Discussion

Plaintiff argues that the ALJ improperly failed to (a) consider all her medically determinable impairments, including her developmental delay, speech, and language

- 20 -

impairments; (b) assess the functional limitations caused by her ADHD, and (c) evaluate

her mother's credibility under Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)

(subsequent history omitted). The Commissioner disagrees; the Court agrees.

In the domain of attending and completing tasks, a child in the age range of six

years to twelve years' old[6]

should be able to focus [her] attention in a variety of situations in order to
follow directions, remember and organize [the child's] materials, and
complete classroom and homework assignments. [The child] should be able
to concentrate on details and not make careless mistakes in [the child's] work
(beyond what would be expected in other children [the child's] age who do
not have impairments. [The child] should be able to change [her] activities
or routines without distracting [one's self] or others, and stay on task and in
place when appropriate. [The child] should be able to sustain [his or her]
attention well enough to participate in group sports, read by [himself or
herself], and complete family chores. [The child] should also be able to
complete a transaction task (e.g., be ready for the school bus, change clothes
after gym, change classrooms) without extra reminders and
accommodations.

20 C.F.R. § 416.926a(h)(2)(iv) (alterations added). There is "a range of development and

functioning, and . . . not all children within an age category are expected to be able to do

all of the activities in the examples of typical functioning." 20 C.F.R. § 416.926a(b)(1)

(alteration added). Thus, "limitations of any of the activities in the examples do not

necessarily mean that a child has a 'marked' or 'extreme' limitation . . ." Id. (alteration

added).

---

[6]Plaintiff turned six years' old the month before the hearing.

The record reveals consistent improvement in Plaintiff's functioning, including in her ability to acquire information, e.g., she consistently improved in the academic areas after enrolling in kindergarten, and in other domains, e.g., she improved in work habit skills when in kindergarten. Also consistent in the record, however, are the observations of her mother and of various examiners that Plaintiff had difficulty staying focused, was impulsive, and "shut down" when presented with an activity in which she was not interested. These observations are included in the same documents and testimony as were comments about Plaintiff's ability to acquire and use information and to interact and relate with others. Yet, the ALJ found that Plaintiff had a marked limitation in the former, a less than marked limitation in the latter, and no limitation in the domain of attending and completing tasks.

Citing Dr. Smith's diagnosis, the ALJ also found that Plaintiff had an oppositional defiant disorder, moderately severe. This diagnosis appeared in Dr. Smith's August 2004 letter, but not in either of his two treatment notes. On the other hand, the diagnosis of developmental delay and speech and language delay consistently appeared in the record, including as impairments listed on the Childhood Disability Evaluation Form. The ALJ did not list either delay as a severe impairment or discuss why he found neither to be severe.

The ALJ also summarily concluded that Plaintiff's mother was "essentially" credible. If she is credible as to Plaintiff's limitations in interacting with others, it would

seemingly follow that she is credible as to Plaintiff's limitations in attending and completing tasks.

In short, the ALJ's decision includes internal inconsistencies and unexplained omissions. Consequently, the case must be remanded for a more thorough evaluation of the record and an explanation thereof.

For the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is REVERSED and this case is REMANDED for further proceedings as set forth above.

THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 28 day of February, 2007.

- 23 -